**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MISSOURI**
**EASTERN DIVISION**

| | | |
|---|---|---|
| RAYMOND E. CAIN, JR., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 4:19-CV-2914 SRW |
| | ) | |
| ANDREW M. SAUL, | ) | |
| Commissioner of Social Security | ) | |
| Administration, | ) | |
| | ) | |
| Defendant. | ) | |

**MEMORANDUM AND ORDER**

This matter is before the Court on review of an adverse ruling by the Social Security

Administration. The Court has jurisdiction over the subject matter of this action under 42 U.S.C.

§ 405(g). The parties have consented to the exercise of authority by the United States Magistrate

Judge pursuant to 28 U.S.C. § 636(c). Plaintiff filed a Brief in support of the Complaint. (ECF

No. 14). Defendant filed a Brief in Support of the Answer. (ECF No. 18). The Court has

reviewed the parties' briefs and the entire administrative record, including the transcripts and

medical evidence. Based on the following, the Court will affirm the Commissioner's decision.

## I. Procedural History

On October 3, 2016, plaintiff Raymond E. Cain, Jr. ("Plaintiff") filed an application for a

period of disability and disability insurance benefits under Title II, 42 U.S.C. §§ 401, *et seq.* with

an alleged onset date of June 6, 2016. (Tr. 11, 230). After Plaintiff's application was denied on

initial consideration (Tr. 113), he requested a hearing from an Administrative Law Judge (ALJ).

(Tr. 121).

Plaintiff and counsel appeared for an initial hearing on March 1, 2018. (Tr. 10, 54-77).
Plaintiff testified concerning his disability, daily activities, functional limitations, and past work.
The ALJ also received testimony from vocational expert Brenda Young. On June 22, 2018, the
ALJ issued a decision determining Plaintiff was not disabled. (Tr. 92-103). The Appeals Council
granted Plaintiff's request for review, and on September 20, 2018, remanded the case to the ALJ
for evaluation of the Compensation and Pension Examination Reports submitted by Julie M.
Mastnak, Ph.D. and Sarah K. Wahl, Ph.D. (Tr. 108-111). A supplemental hearing was held on
December 6, 2018, in which Plaintiff and vocational expert Susan Johnson testified. (Tr. 31-21).
The ALJ issued a decision denying Plaintiff's application on May 24, 2019. (Tr. 7-8). The
Appeals Council denied Plaintiff's request for review on September 5, 2019. (Tr. 1).
Accordingly, the ALJ's decision stands as the Commissioner's final decision.

## II.  Evidence Before the ALJ

### A.  Disability Reports, Function Reports and Hearing Testimony

Plaintiff was born on January 26, 1955 and was 61 years old on his alleged onset date.
(Tr. 230, 284). He earned a bachelor's degree in Industrial Technology, a Ph.D. in Career and
Technical Education, and obtained specialized training as a commercial pilot. (Tr. 36, 300).
Plaintiff's prior jobs included: surface associate at an optical laboratory, substitute teacher,
package handler, campus academic dean, and assistant professor. (Tr. 287-92, 301, 315-22, 374-
75). He has been married since 1976. (Tr. 231).

 Plaintiff listed his disabling impairments as major depressive disorder, psychosis and
paranoia, social phobia and anxiety, attention deficit hyperactivity disorder, anxiety and panic

attacks, insulin dependent diabetes, hypertension, syncope, degenerative joint disease of the neck and spine, and eosinophilic esophagitis. (Tr. 299).

In his December 2016 Function Report (Tr. 329-36), Plaintiff reported that his major depressive disorder first manifested while he was in the U.S. Navy between 1972 to 1974. Plaintiff claimed he was "rediagnosed" in 1995 and since that time has been on medication for depression and participated in psychotherapy. (Tr. 329). Plaintiff claimed his condition continued to worsen due to decreased memory capacity, general ambivalence, and an inability to "think straight." *Id.* He claimed his "15 or so medications" created "another level of depression and anxiety," but admitted that he "many times" did not take his prescriptions as directed and missed dosages. *Id.*

Plaintiff reported most days he would do nothing and stay in bed. (Tr. 330). He explained he had problems choosing outfits due to confusion, did not have the "gumption" to bathe, did not maintain his hair or shave, and often forgot to eat. *Id.* He stated that he usually needed his wife to remind him to "do something out of the household." (Tr. 331). He reported, however, that he was able to sweep and mop floors, do laundry, use public transportation, shop for the household, pay bills, count change, handle a savings account, and use a checkbook. (Tr. 331-33). Plaintiff reported he went outside once or twice per week despite his adversity to social situations and preference to stay home. (Tr. 332). When leaving his home, Plaintiff claimed he required help with directions and physical stability because he sometimes got confused about where he was or where he was going. *Id.* He listed various hobbies and interests he previously enjoyed, such as watching trains, fishing, hiking, and playing musical instruments, but stated those activities no longer satisfied him. (Tr. 333). He stated he had problems getting along with

3

family and friends because he was like a "bomb about to explode" and had a "real issue with

ineptness, sense of logic, judgment, and blatant ignorance." *Id.* Plaintiff further reported

difficulties in talking, hearing, seeing, memory, completing tasks, concentration, understanding,

following instructions, using his hands, and getting along with others. (Tr. 334). He stated he did

not want to talk or listen as it was a "waste of time," sometimes saw things that were not there,

and would lose his concentration mid-sentence. *Id.* He stated he was able to follow written

instructions if they were simple but felt as he did not follow spoken instructions well because he

would forget what he was told. *Id.* He stated he had a problem with authority figures giving him

orders because they were "dumber than" him. *Id.* Plaintiff reported he has been fired or laid off

in the past due to his problems getting along with people. *Id.* He described himself as "very

irritable" and "prone to fly of the handle," which caused him to suffer from "serious depressive

meltdowns several times a day, including spontaneous crying." (Tr. 335).

      Plaintiff's wife completed a third-party Function Report. (Tr. 340-47). She has known

Plaintiff for fifty (50) years and spends every day with him. (Tr. 340). According to his wife,

Plaintiff tended to sleep late and engaged in minimal activity when awake. *Id.* She stated he had

a hard time getting dressed, rarely engaged in personal care, such as bathing or shaving, and

needed reminders to care for his personal appearance and to take medicine. (Tr. 341-42). She

reported Plaintiff prepared his own meals two to three times per week, which mostly consisted of

sandwiches and soups, but it would take him up to an hour to prepare. (Tr. 342). She stated he

was able to perform light cleaning, help with laundry, and assist in paying bills. She stated he

went outside once or twice per week, used public transportation, and was able to leave the home

without assistance. (Tr. 342-43). She reported Plaintiff had lost interest in most activities, did not

maintain his prior hobbies, and did not spend time with others. (Tr. 344). She claimed depression affected his ability to understand, talk, follow instructions, complete tasks, and maintain memory and concentration. (Tr. 345). She reported, however, he was able to follow written instructions "very well," was "typically ok" in following spoken instructions as he "understands what is requested," and handled changes in routine "relatively well." (Tr. 345-46). As for his physical abilities, she stated he could walk one half mile before needing to rest for five to ten minutes. (Tr. 345).

Plaintiff reported he was prescribed the following medications as of March 1, 2018: Lorazepam (anxiety); Amlodipine (blood pressure); Bupropion (anxiety); Zolpidem (sleep aid); Metformin (diabetes); Pravastatin (cholesterol); Losartan (blood pressure); Cetirizine (allergies); Vitamin D (supplement); Aspirin (heart health); Aripiprazole (psychosis); Insulin (diabetes); Omeprazole (stomach); Mirtazapine (depression); Acetaminophen (pain), Fluticasone (oral inhaler); and HCTZ (water pill). (Tr. 379).

The Field Office interviewer who took Plaintiff's application for disability and disability insurance benefits noted he had no difficulties in coherency, reading, understanding, concentrating, talking, or answering. (Tr. 285). He further noted "no difficulties" under the section for describing Plaintiff's behavior, appearance, grooming, or degree of limitations. *Id.*

Plaintiff testified at the December 6, 2018 hearing that his depression was worse in the winter and he would spend most of his time at home. (Tr. 42). He testified he suffered from delusions but could not provide details. *Id.* He further testified to paranoia, poor short-term memory, and a disinterest in recreational activities. (Tr. 43). He stated he would leave the house only to grocery shop with his wife. (Tr. 44). He denied participating in social activities, such as

church, sporting events, or visiting his grandchildren who lived locally. *Id.* He stated he needed medication to sleep and had issues controlling his blood sugar. (Tr. 44-45). He claimed diabetes caused him to have a lack of feeling in his feet and fingertips, and neuropathy caused him to experience shooting pains when he walked, but his eosinophilic esophagitis was mostly controlled by medication. (Tr. 45-46).

At the hearing, vocational expert Susan Johnson testified Plaintiff's past work as a professor or faculty member was classified as light work, while his work as a dean of students was sedentary. (Tr. 48). Ms. Johnson was asked to testify about the employment opportunities for a hypothetical person of Plaintiff's age, education, and work experience who was limited to only simple, routine, repetitive tasks, few changes in work setting, no tandem tasks, only occasional work related decisions, with only occasional interactions with supervisors, coworkers, and no interactions with the general public. *Id.* According to Ms. Johnson, such an individual would be unable to perform Plaintiff's past work but would be able to perform other jobs in the national economy, such as automobile washer, labeler, and addresser. (Tr. 48-49). She further testified all work would be precluded if the hypothetical individual required redirection to task two times per day, was off-task eleven percent or more of an eight-hour workday or had one or more unexcused absences in a month. (Tr. 49-50).

### B.  Medical Evidence

The medical record contains reports prior to Plaintiff's alleged onset date of June 6, 2016. These records include 2012 and 2013 treatment notes from the Missouri Medical Center related to his diagnosis of eosinophilic eosinophils (Tr. 468-87, 491-95, 498-03); a December 2012 sleep study report (Tr. 490-91); outpatient therapy session notes from January 2013 to April 2013 for

6

treatment of his depression and anxiety (Tr. 447-67); and treatment notes from the Veterans Affairs Medical Center in Dallas, Texas from 2014 to 2016 related to medication refills, diabetes management, eosinophilic eosinophils check-ups, mental health counseling, colonoscopy, EKG, radiological scans, and lab work. (Tr. 549-57).

During the period under review, Plaintiff received all treatment from the Veterans Affairs Medical Center in St. Louis, Missouri (the "VA"). On July 29, 2016, Plaintiff presented for a neuropsychological evaluation with Dr. John Westhafer, Ph.D. for complaints of declining memory. (Tr. 529). Dr. Westhafer summarized the results as "consistent with intact cognition in the context of depression." (Tr. 532). He found "mild psychomotor retardation and inattention with reduced task engagement due to depression, but no cognitive deficits, and specifically, memory was intact." *Id.* Psychotherapy was recommended along with increased engagement in social, active, and healthy activities. (Tr. 532-33). On August 2, 2016, treatment notes reflect Plaintiff's eosinophilic esophagitis to be "well controlled" with medication. *Id.*

On August 5, 2016, Plaintiff presented to Dr. Anandhi Sethupathi who listed his diagnoses as major depressive disorder, anxiety, and history of panic attacks. At the time of the visit Plaintiff was homeless, living with his wife in a shelter, and searching for employment. Dr. Sethupathi noted Plaintiff had normal speech, was pleasant and cooperative, and possessed fair insight and judgment. Dr. Sethupathi reported that Plaintiff's psychosis was in remission with no more paranoia, but he presented with depressive symptoms due to unemployment and homelessness. (Tr. 516).

On October 13, 2016, Plaintiff began outpatient mental health treatment for depression with Clinical Psychologist Dr. Raymond Dalton and agreed to maintain regular psychotherapy

visits. (Tr. 707-11). On October 31, 2016, Plaintiff presented to Dr. William M. Irvin, Jr. to establish additional care for depression. (Tr. 703-06, 1157). Plaintiff reported his energy and focus was "somewhat improved" on medication and mostly denied psychosis, paranoia, manic symptoms, and panic attacks. (Tr. 703-04). On November 16, 2016, Dr. Dalton wrote that Plaintiff was "depressed and tearful," but surmised that his recent move to St. Louis, Missouri from Dallas, Texas might have been "somewhat disorienting." Dr. Dalton provided Plaintiff with social service resources. (Tr. 1142-43).

On November 23, 2016, Plaintiff attended a pharmacy consult for diabetes management. (Tr. 684). Plaintiff reported he was no longer homeless and was living in an apartment with his wife. (Tr. 685). The notes reflect a diagnosis of depression with psychosis in partial remission. *Id.* Plaintiff admitted to being noncompliant in administering his insulin for diabetes. *Id.* On the same date, Plaintiff reported to a social worker that he "walks for exercise approximately two miles daily." (Tr. 697). On December 9, 2016, Plaintiff again reported his noncompliance in monitoring his blood sugar and "not taking medications for several days at a time." (Tr. 729).

A clinical pharmacist note, dated December 30, 2016, indicated Plaintiff was continuing to struggle with depression but was doing "much better" with medication compliance. (Tr. 1075). On January 11, 2017, Plaintiff reported to Dr. Irvin that he believed his medication was keeping him "stable throughout the day, without meltdowns." (Tr. 1072). Dr. Irvin's treatment notes described Plaintiff as cooperative with good insight and judgment and "doing better." *Id.* On January 26, 2017, Dr. Dalton's treatment notes described Plaintiff as coherent, more talkative, narrative, reflective, and "more upbeat with attitude of one who has begun to rally." (Tr. 1062).

8

On February 2, 2017, Dr. Dalton wrote Plaintiff displayed "sustainable resilience." (Tr. 1052). On February 6, 2017, Plaintiff self-reported as doing "ok in the interim" with "some improvement in his mood, anxiety and paranoia," which he attributed to adjustments in his medication. (Tr. 1041). Plaintiff also denied feelings of hopelessness or crying spells. *Id.* On February 22, 2017, Dr. Irvin noted Plaintiff's depression could be seasonally related. (Tr. 1021). Dr. Irvin described Plaintiff as cooperative with good insight and judgment and noted Plaintiff's reports of good sleep and appetite. *Id.* On March 1, 2017, Dr. Dalton noted Plaintiff displayed "resilience in keeping appointments and accepting demands of long-term psychiatric treatment." (Tr. 1013). On March 15, 2017, Plaintiff reported to Dr. Irvin that he had an improved mood with satisfactory sleep and appetite. (Tr. 987). Dr. Irvin noted Plaintiff was "[d]oing better" and planned to follow up with him in two months. *Id.* On March 22, 2017, Dr. Dalton described Plaintiff's mood and affect as "resilient" with "improved" insight and judgment. (Tr. 982).

Medical records from February 14, 2017, March 31, 2017, and November 13, 2017 reflect that Plaintiff's diabetes and hypertension were being appropriately managed and the goals of therapy for those conditions were achieved. (Tr. 974, 1033, 1322).

On April 14, 2017 and April 17, 2017, Dr. Irvin described Plaintiff with a depressed mood; however, he wrote that Plaintiff was cooperative with good eye contact, had linear thought form, and showed good insight and judgment. (Tr. 950-52). On April 21, 2017, Dr. Dalton described Plaintiff as having a "depressive mood" with no increases in resilience. (Tr. 939). On April 28, 2017, Dr. Dalton noted Plaintiff had a "brighter mood with congruent affect" despite "spikes of anxiety." (Tr. 935). Plaintiff was noted to be making progress as he "appreciated the value of positive experiences." *Id.*

9

On May 12, 2017, Plaintiff completed an eight-session cognitive and behavioral skills group. (Tr. 929). Licensed psychologist Jamie R. Fickert continuously described him as an active and engaged participant. (Tr. 929, 961, 976, 980). Notes from the sessions reported Plaintiff as "receptive to interventions" with the appearance of "making adequate progress toward group goals of improved mood regulation, coping, and problem solving." (Tr. 952).

On May 15, 2017, a physical examination described Plaintiff as having fair to good eye contact, "a little better" mood/affect, and a linear and goal directed thought process with no reported delusions or hallucinations. (Tr. 923). Dr. Dalton noted, however, Plaintiff reported sleeping the whole weekend due to a lack of energy. (Tr. 928). On May 25, 2018, Dr. Dalton noted Plaintiff exhibited an increased drive to re-engage in intellectual interests, was making progress, and "displayed stronger investment in Behavioral Activation." (Tr. 919). On June 1, 2017, Plaintiff reported to Dr. Dalton he spent the majority of the day sleeping but was able to attend a cook-out and expressed a desire to pursue a Tai Chi class for seniors. (Tr. 917). On June 26, 2017, Dr. Dalton described Plaintiff with an "[i]mproved mood" and recorded Plaintiff's self-desire to "motivate himself daily." (Tr. 905). Dr. Dalton stated Plaintiff was considering reviewing his pilot licensure so he could "return to flying." *Id.*

On July 5, 2017, Dr. Irvin noted Plaintiff was "pleased he made dinner on his own for he and his spouse," had an "[i]mproved mood with congruent affect," and "used antianxiety medication to manage duress with crowds." (Tr. 887). Dr. Irvin noted progress with his goals due to Plaintiff's increased socialization with family and "[p]lans to do more in the community on his own." (Tr. 888). On July 12, 2017, Dr. Irvin recorded Plaintiff's report of his daughter visiting from Florida and his ability to sightsee with family. (Tr. 885). His notes describe Plaintiff with

an "improved mood and congruent affect." On July 19, 2017, Dr. Irvin described Plaintiff as

having sustained motivation, coherent thought processing, and active self-management of dreads.

(Tr. 883). Plaintiff reported that despite his fear of the Metro system, he used it to go shopping

and visit his daughter in Jefferson City. *Id*. On July 24, 2019, Dr. Irvin again found Plaintiff to

have sustained motivation and coherent thought processing. (Tr. 873-74). On July 31, 2017,

Plaintiff reported to Dr. Irvin he was doing "pretty good" despite not being "particularly happy."

(Tr. 867). Dr. Irvin described Plaintiff's mental status as "adequate" attention and concentration.

(Tr. 869).

Dr. Dalton's treatment notes from August 7, 2017 and August 14, 2017 reflect two weeks

of no progress with depression and anxiety symptoms. (Tr. 1430, 1442). On August 29, 2017,

Dr. Irvin reported Plaintiff to be "feeling better" with good sleep, appetite, insight, and judgment.

(Tr. 1407). On August 31, 2017, Dr. Dalton reported Plaintiff to be "improving" and noted he

purchased a car which would allow him to have access to a greater range of positive experiences.

(Tr. 1403). Medical records indicate on September 13, 2017, Plaintiff's diabetes management

greatly improved, and his dosage of insulin was reduced. (Tr. 1392,1394). On September 20,

2017, Dr. Dalton commended Plaintiff for joining the YMCA and indicated his belief that

Plaintiff was medically improving. (Tr. 1375). On September 25, 2017, Dr. Irvin reported

Plaintiff felt "pretty good," was cooperative, and doing better. (Tr. 1372). Dr. Irvin ordered

Plaintiff to continue with his psychotropic medications and schedule a three-month follow up.

On October 4, 2017, Dr. Dalton found Plaintiff to be making progress by acclimating to new

people at an exercise facility and practicing self-management. (Tr. 1348). On October 11, 2017,

Dr. Dalton noted Plaintiff had a depressed mood and higher anxiety. (Tr. 1343). On November 1,

2017, Dr. Dalton described Plaintiff as having a "low energy week" but reported Plaintiff's feedback of feeling "better prepared to make the small changes that will build confidence for later changes." (Tr. 1335). Dr. Dalton noted Plaintiff's progress stalled with increased anxiety. (Tr. 1336). On November 16, 2017, Dr. Dalton described Plaintiff as coherent and enthusiastic. (Tr. 1315). On November 22, 2017, Dr. Dalton found Plaintiff to have made progress with inherent resilience to move forward. (Tr. 1308).

On December 1, 2017 and December 7, 2017, Dr. Dalton noted no additional progress in Plaintiff's depressive condition. (Tr. 1297, 1300). On December 26, 2017, Plaintiff described his mood to Dr. Irvin as "pretty steady." (Tr. 1278). Dr. Irvin described Plaintiff as cooperative with good insight and judgment, linear thought form, improved mood, and mildly anxious affect. *Id.* On December 29, 2017, Plaintiff participated in a self-inventory assessment with an Occupational Therapist to determine goals and areas of focus. (Tr. 1272). The assessment records described Plaintiff as having the ability to listen and follow directions, stay focused, and articulate thoughts and ideas. *Id.*

The record reflects on January 10, 2018, Plaintiff attended the first of an eight-session Occupational Therapy Stress Management Group in which Plaintiff was described to have participated meaningfully, maintained a good level of understanding, and verbally acknowledged understanding of the topic. (Tr. 1265-66). He completed the course on February 28, 2018 with "all goals met." (Tr. 1655-56).

On January 11, 2018, Plaintiff attended a VA Occupational Therapy Creative Writing Group in which he wrote a poetic piece and read it from the podium. (Tr. 1261). Plaintiff was described by Rita Reichert, Occupational Therapy Assistant, to have done an "excellent job with

12

his writing and reading and was given positive recognition for his efforts." *Id.* Plaintiff continued

his participation in the writing group through March 29, 2018 and treatment notes reflect that he

received constant praise for his writing and presentations. (Tr. 1644-49, 1651-53, 1661-64).

Plaintiff's group therapy records show no difficulties in his ability to get along with the

occupational therapist or his peers.

On January 12, 2018, Dr. Dalton described Plaintiff's thought processing as coherent and

ideationally very active. (Tr. 1259). He found Plaintiff's attention and concentration to be good

and was impressed with Plaintiff's recent membership in the occupational therapy creative

writing group. *Id.* Dr. Dalton further noted Plaintiff had an increased positive mood, softened

reactions to negative social evaluations, and decreased worrisome or fearful cognitions. (Tr.

1260).

From April 5, 2018 to June 21, 2018, Plaintiff participated in a second twelve-session

Creative Writing Series for Occupational Therapy. (Tr. 1628). On May 31, 2018, Plaintiff's

writing was described as very detailed with creativity and it was reported he maintained good

eye contact, asked appropriate questions, and actively participated throughout the session. *Id.*

Plaintiff received similar positive reports of participation and well-written submissions

throughout the program. (Tr. 1630-44, 1657-60). Again, Plaintiff's group therapy records show

no difficulties in his ability to get along with the occupational therapist or his peers.

Medical Records from April 24, 2018 and October 24, 2018 reflect that his GERD was

controlled on medication and his eosinophilic esophagitis was "clinically doing well without

dysphagia." (Tr. 1516, 1521, 1576). On April 2, 2018, Dr. Irvin noted Plaintiff described his

condition as "balanced." (Tr. 1565). Dr. Irvin noted Plaintiff had a good mood and a calm and

13

stable affect. *Id.* On June 5, 2018, Plaintiff self-reported to Dr. Irvin that he felt "pretty good" and "everything's been good." (Tr. 1560). An August 7, 2018 Mental Health Diagnostic Study performed by psychologist Jennifer Romo found Plaintiff to have a depression scale score of 13, reflecting moderate depression. (Tr. 1578). The lowest score being 1 with minimal depression and the highest score being 27 with severe depression. *Id.*

### C. Opinion Evidence

The record contains an October 12, 2017 Compensation and Pension Note prepared by Julie Mastnak, Ph.D., licensed psychologist with the VA. (Tr. 271-283). The Note summarizes Plaintiff's persistent depressive disorder diagnosis, symptoms, and clinical findings. Dr. Mastnak remarked that Plaintiff's condition contributed to significant impairment in social functioning and occupational functioning. (Tr. 282).

The record also contains a January 3, 2017 Disability Determination Explanation completed by non-examining state agency physician, Margaret Sullivan, Ph.D. (Tr. 78-90). Dr. Sullivan reported Plaintiff to have a moderate limitation in ability to understand and remember detailed instructions; carry out detailed instructions; maintain attention and concentration for extended periods; work in coordination with or in proximity to others without being distracted by them; complete a normal workday and workweek without interruptions from psychologically based systems and to perform at a consistent pace without an unreasonable number and length of rest periods; interact appropriately with the general public; and get along with coworkers or peers without distracting them or exhibiting behavioral extremes. *Id.* She reported no significant limitations in Plaintiff's ability to remember locations and work-like procedures; understand and remember very short and simple instructions; carry out very short and simple instructions;

perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances; sustain an ordinary routine without special supervision; make simple work-related decisions; ask simple questions or request assistance; accept instructions and respond appropriately to criticism from supervisors; and maintain socially appropriate behavior and to adhere to basic standards of neatness and cleanliness. *Id.*

On March 15, 2017, Dr. Irvin completed a one-page handwritten "Assessment for Social Security Disability Claim," however, the Court finds this document to be too illegible to summarize. (Tr. 796). On the same date, Dr. Irvin also submitted a "Mental Residual Functional Capacity Assessment." (Tr. 797). This assessment reflects Dr. Irvin's opinion that Plaintiff has a marked[1] inability to maintain adequate attention, concentration and focus on work duties; make appropriate simple work related decisions; complete a normal work week without interruptions from psychologically based symptoms; interact appropriately with the general public or customers; work in coordination with, or in close proximity to others; accept instructions and respond appropriately to criticism from supervisors; respond appropriately to routine changes in the work setting; respond appropriately to routine work related stressors; demonstrate reliability in a work setting; and sustain extended periods of employment (greater than 6 months) without decompensation from periodic exacerbation of psychiatric symptoms. Dr. Irvin further opined Plaintiff had a moderate[2] inability to maintain a work schedule and be constantly punctual;

---

[1] A "marked" ability indicates "a complete inability to perform the particular activity in a normal work setting, even for short periods of time. This would be less than occasionally, or less than 1/3 of the work day."

[2] A "moderate" inability indicates that "the activity is not totally precluded but is significantly impaired in terms of proficiency and/or the ability to sustain the particular activity over the course of a work day/week. It further indicates the activity can be performed occasionally but not frequently, in a normal work setting, no more than 2/3 of the work day."

understand, remember and carry out simple (one or two-step) work instructions and procedures; and understand, remember and carry out detailed (3 or more steps) instructions and procedures. Dr. Irvin lastly opined that Plaintiff had a mild[3] inability to maintain socially appropriate behavior and adhere to basic standards of neatness and cleanliness and to demonstrate reliability in a work setting.

The record further contains a second Compensation and Pension Examination Note, dated August 17, 2017, submitted by Sarah Kohler Wahl, Ph.D., licensed psychologist with the VA. (Tr. 839). The Note summarized Plaintiff's clinical findings and current symptoms, listed his diagnosis as persistent depressive disorder with persistent major depressive episode, and opined that Plaintiff had a "total occupational and social impairment." (Tr. 840-48).

On January 30, 2018, Dr. Irvin completed a one paragraph "Physician's Assessment for Social Security Disability Claim," in which he expressed his opinion that Plaintiff lacked the capacity for gainful employment due to his diagnosed depression. (Tr. 1482). On November 2, 2018, Dr. Irvin wrote a letter stating: "I do believe your psychiatric condition prevents your ability to sustain gainful employment. In my medical opinion, an attempt to work would reasonably be anticipated to threaten relapse of your psychiatric condition." (Tr. 1745).

On November 20, 2018, Dr. Irvin submitted a second one-page handwritten "Assessment for Social Security Disability Claim," which reflected his opinion that Plaintiff's severe depression and anxiety prevented him from sustaining gainful employment. (Tr. 1743). On the same day, Dr. Irvin also submitted a Mental Residual Functional Capacity Assessment. (Tr.

---

[3] A "mild" inability indicates "the ability to perform the particular activity is slightly impaired. Indicates the activity can be performed within acceptable tolerances on a sustained basis over the course of a normal work schedule."

1744). Dr. Irvin opined that Plaintiff had an extreme[4] inability to maintain adequate attention, concentration and focus on work duties; use judgment and make appropriate simple work related decisions; stay on task without distractions or need for redirection; interact appropriately with the general public or customers; work in coordination with, or in close proximity to others; accept instructions and respond appropriately to criticism from supervisors; respond appropriately to routine changes in the work setting; control emotions and deal with routine work related stressors; demonstrate reliability in a work setting; and sustain extended periods of employment (greater than 6 months) without decompensation from periodic exacerbation of psychiatric symptoms. Dr. Irvin further opined that Plaintiff had a marked ability to maintain a work schedule and be consistently punctual; understand, carry out and communicate to others simple (one or two-step) work instructions; understand, sequence and carry our detailed (3 or more steps) instructions; and work independently at a competitive pace (without constant supervision). Dr. Irvin lastly opined that Plaintiff had a moderate ability to maintain socially appropriate behavior and adhere to basic standards of neatness and cleanliness. Dr. Irvin wrote that he would likely be off task more than 15% of the day due to his psychiatric impairments and estimated that he would have to miss work, on average, three days per month.

### III.  Standard of Review and Legal Framework

To be eligible for disability benefits, Plaintiff must prove he is disabled under the Act. *See Baker v. Sec'y of Health & Human Servs.*, 955 F.2d 552, 555 (8th Cir. 1992); *Pearsall v. Massanari*, 274 F.3d 1211, 1217 (8th Cir. 2001). The Act defines a disability as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or

---

[4] An "extreme" inability indicates complete inability to perform the activity on a sustained basis.

mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §§ 423(d)(1)(A) and 1382c(a)(3)(A). A claimant will be found to have a disability "only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. §§ 423(d)(2)(A) and 1382c(a)(3)(B). *See also Bowen v. Yuckert*, 482 U.S. 137, 140 (1987).

The Social Security Administration has established a five-step process for determining whether a person is disabled. *See* 20 C.F.R. § 404.1520; *Moore v. Astrue*, 572 F.3d 520, 523 (8th Cir. 2009). Steps one through three require the claimant to prove (1) he is not currently engaged in substantial gainful activity, (2) he suffers from a severe impairment, and (3) his disability meets or equals a listed impairment. *Pate-Fires v. Astrue*, 564 F.3d 935, 942 (8th Cir. 2009); *see also Bowen*, 482 U.S. at 140-42 (explaining the five-step process). If the claimant does not suffer from a listed impairment or its equivalent, the analysis proceeds to steps four and five. *Pate-Fires*, 564 F.3d at 942. "Prior to step four, the ALJ must assess the claimant's residual functional capacity (RFC), which is the most a claimant can do despite [his] limitations." *Moore*, 572 F.3d at 523 (citing 20 C.F.R. § 404.1545(a)(1)). At step four, the ALJ determines whether claimant can return to his past relevant work, "review[ing] [the claimant's] [RFC] and the physical and mental demands of the work [claimant has] done in the past." 20 C.F.R. § 404.1520(e). The burden at step four remains with the claimant to prove his RFC and establish that he cannot return to his past relevant work. *Moore*, 572 F.3d at 523; *accord Dukes v. Barnhart*, 436 F.3d 923, 928 (8th Cir. 2006); *Vandenboom v. Barnhart*, 421 F.3d 745, 750 (8th Cir. 2005). If the

ALJ holds at step four that claimant cannot return to past relevant work, the burden shifts at step

five to the Administration to establish the claimant maintains the RFC to perform a significant

number of jobs within the national economy. *Banks v. Massanari*, 258 F.3d 820, 824 (8th Cir.

2001); *see also* 20 C.F.R. § 404.1520(f).

The Court's role on judicial review is to determine whether the ALJ's findings are

supported by substantial evidence in the record as a whole. *Pate-Fires*, 564 F.3d at 942.

Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to

support a conclusion." *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019). "[T]he threshold for

such evidentiary sufficiency is not high." *Id.* Stated another way, substantial evidence is "less

than a preponderance, but enough that a reasonable mind might accept it as adequate to support a

decision." *Juszczyk v. Astrue*, 542 F.3d 626, 631 (8th Cir. 2008); *see also Wildman v. Astrue*, 964

F.3d 959, 965 (8th Cir. 2010) (same). In determining whether the evidence is substantial, the

Court considers evidence that both supports and detracts from the ALJ's decision. *Cox v. Astrue*,

495 F.3d 614, 617 (8th Cir. 2007).

The Eighth Circuit has repeatedly emphasized a district court's review of an ALJ's

disability determination is intended to be narrow, and courts should "defer heavily to the findings

and conclusions of the Social Security Administration." *Hurd v. Astrue*, 621 F.3d 734, 738 (8th

Cir. 2010) (quoting *Howard v. Massanari*, 255 F.3d 577, 581 (8th Cir. 2001)). Despite this

deferential stance, a district court's review must be "more than an examination of the record for

the existence of substantial evidence in support of the Commissioner's decision." *Beckley v.

Apfel*, 152 F.3d 1056, 2059 (8th Cir. 1998). The district court must "also take into account

whatever in the record fairly detracts from that decision." *Id.*; *see also Stewart v. Sec'y of Health*

& *Human Servs.*, 957 F.2d 581, 585-86 (8th Cir. 1992) (setting forth factors the court must

consider). Finally, a reviewing court should not disturb the ALJ's decision unless it falls outside

the available "zone of choice" defined by the evidence of record. *Buckner v. Astrue*, 646 F.3d

549, 556 (8th Cir. 2011). A decision does not fall outside that zone simply because the reviewing

court might have reached a different conclusion had it been the finder of fact in the first instance.

*Id.; see also McNamara v. Astrue*, 590 F.3d 607, 610 (8th Cir. 2010) (if substantial evidence

supports the Commissioner's decision, the court "may not reverse, even if inconsistent

conclusions may be drawn from the evidence, and [the court] may have reached a different

outcome.")

## IV.  The ALJ's Decision

The ALJ's decision in this matter conforms to the five-step process outlined above. (Tr.

10-22). The ALJ found Plaintiff met the insured status requirements on June 30, 2018. (Tr. 13).

The ALJ further found Plaintiff had not engaged in substantial gainful activity between June 6,

2016, the alleged onset date, and June 30, 2018, the date he was last insured. *Id.*

At step two, the ALJ found Plaintiff had the severe impairments of major depressive

disorder, anxiety disorder, adjustment disorder, degenerative disc disease, osteoarthritis of the

hips, and diabetes mellitus. *Id.* The ALJ concluded Plaintiff's eosinophilic esophagitis,

hypertension, gastroesophageal reflux disease (GERD), hyperlipidemia, and obstructive sleep

apnea were non-severe as the record reflected that these conditions were controlled with

medication. The ALJ noted that although neuropathy was noted in the record, Plaintiff did not

allege any severe physical limitations from the condition. *Id.*

The ALJ determined at step three, through the date last insured, Plaintiff did not have an impairment or combination of impairments that met or medically equaled the severity of a listed impairment, including listings 1.04 (disorders of the spine) and 9.00 (endocrine disorders). (Tr. 14). In addition, the ALJ found Plaintiff's mental impairments did not meet or equal the criteria of listings 12.04 (depressive, bipolar and related disorders) or 12.06 (anxiety and obsessive-compulsive disorders). *Id.* The ALJ analyzed Plaintiff's mental impairments under the paragraph B criteria (20 C.F.R., Part 404, Subpart P, Appx. 1) and determined Plaintiff had a mild limitation in interacting with others, and had moderate limitations in understanding, remembering, or applying information; concentrating, persisting, or maintaining pace; and adapting or managing oneself. (Tr. 14-15). The ALJ also found Plaintiff did not meet the paragraph C criteria. (Tr. 17). Plaintiff does not challenge the ALJ's assessment of his mild and moderate impairments or the paragraphs B and C criteria.

The ALJ next determined Plaintiff had the RFC to perform medium work as defined in 20 CFR 404.1567(c), except he was limited to simple, routine, repetitive tasks. He could have occasional work-related decisions and few changes in the work setting. He was unable to complete tandem tasks and was limited to occasional interactions with supervisors and coworkers. (Tr. 17). In assessing Plaintiff's RFC, the ALJ summarized the medical record, written reports from Plaintiff and his spouse, Veronica Cain, as well as Plaintiff's testimony regarding his abilities, conditions, and activities of daily living. (Tr. 19-20). While the ALJ found Plaintiff's medically determinable impairments could reasonably be expected to produce the alleged symptoms, the ALJ also determined Plaintiff's statements concerning the intensity, persistence, and limiting effects of those symptoms were "not entirely consistent" with the

medical and other evidence. (Tr. 18). In support, the ALJ cited to Plaintiff's Function Report which reflected he could manage his own funds, prepare meals, do housework (including laundry, sweeping, and mopping), follow simple instructions, and shop online. *Id.* The Function Report also showed he was able to visit his daughter in Jefferson City, Missouri and eat with his wife at a casino buffet. *Id.* In reviewing Plaintiff's medical record from 2016 to 2018, including occupational therapy notes and treatment notes from his treating physician, the ALJ found it failed to support his allegations of disabling limitations. (Tr. 19). Plaintiff challenges the ALJ's RFC assessment and the ALJ's evaluation of the opinion evidence in the record.

At step four, the ALJ concluded Plaintiff was unable to perform any past relevant work. (Tr. 20). His age on his date last insured placed him in the "closely approaching retirement age" category. (Tr. 21). He had at least a high school education and was able to communicate in English. *Id.* The ALJ found the transferability of job skills was not material to the determination of disability because Plaintiff was "not disabled." *Id.*

The ALJ found at step five that someone with Plaintiff's age, education, work experience, and residual functional capacity could perform work that existed in significant numbers in the national economy, including hand packager, laundry laborer, and day worker (janitor). *Id.* Thus, the ALJ found Plaintiff was not disabled within the meaning of the Social Security Act from June 6, 2016 to June 30, 2018. (Tr. 22).

## V.  **Discussion**

Plaintiff presents two issues for review. First, he asserts the ALJ failed to account for his moderate limitations in concentration, persistence or pace in the RFC determination. Second, he asserts the ALJ erred in failing to properly evaluate the opinion evidence in the record.

22

## A. RFC Determination: Concentration, Persistence or Pace

Plaintiff contends the ALJ's RFC determination is not supported by substantial evidence because the ALJ did not account for his moderate limitations in concentration, persistence or pace. The Commissioner maintains the ALJ's restrictions to simple, routine, and repetitive tasks sufficiently accounted for Plaintiff's moderate limitation in concentrating, persisting, or maintaining pace.

The RFC is defined as what the claimant can do despite his or her limitations and includes an assessment of physical abilities and mental impairments. 20 C.F.R. §§ 404.1545(a), 416.945(a). The RFC is a function-by-function assessment of any individual's ability to do work related activities on a regular and continuing basis. SSR 96-8p, 1996 WL 374184, at *1 (July 2, 1996). It is the ALJ's responsibility to determine the claimant's RFC based on all relevant evidence, including medical records, observations of treating physicians and the claimant's own descriptions of his limitations. *Pearsall*, 274 F.3d at 1217. An RFC determination made by an ALJ will be upheld if it is supported by substantial evidence in the record. *See Cox v. Barnhart*, 471 F.3d 902, 907 (8th Cir. 2006). "[T]he ALJ is not qualified to give a medical opinion but may rely on medical evidence in the record." *Wilcockson v. Astrue*, 540 F.3d 878, 881 (8th Cir. 2008). In making a disability determination, the ALJ shall "always consider the medical opinions in the case record together with the rest of the relevant evidence in the record." 20 C.F.R. § 404.1527(b), 416.927(b); *see also Heino v. Astrue*, 578 F.3d 873, 879 (8th Cir. 2009). There is no requirement, however, that an RFC finding be supported by a specific medical opinion. *Hensley v. Colvin*, 829 F.3d 926, 932 (8th Cir. 2016) (RFC affirmed without medical

opinion evidence); *Myers v. Colvin*, 721 F.3d 521, 527 (8th Cir. 2013) (same); *Perks v. Astrue*, 687 F.3d 1086, 1092-93 (8th Cir. 2012) (same).

In the instant action, the ALJ defined Plaintiff's RFC as follows:

> Specifically, the claimant was limited to a medium exertional level to allow for reduced lifting/carrying, given his degenerative disc disease, and osteoarthritis of the hips – and resulting pain and weakness with increased weight bearing – as well as his diabetes mellitus and accompanying neuropathy in his feet. Further, he was limited to simple, routine, repetitive tasks due to his moderate limitations in understanding, remembering, and applying information, and in concentrating, persisting, and maintaining pace. He could make only occasional work-related decisions, also due to his moderate limitation in understanding, remembering, and applying information, and could have few changes in the work setting, due to his moderate limitation in adapting and managing himself. The claimant could not complete tandem tasks, and was limited to occasional interactions with supervisors and coworkers, on account of his mild limitation in interacting with others.

(Tr. 20).

There is no dispute that Plaintiff has moderate difficulty in the area of concentration, persistence or pace. Instead, Plaintiff contends the RFC failed to account for moderate deficiencies in concentration, persistence or pace. In support, Plaintiff cites to *Newton v. Charter*, 92 F.3d 688 (8th Cir. 1996). In *Newton*, the Eighth Circuit reversed the Commissioner's decision because the ALJ's hypothetical question to the vocational expert during the hearing limited the plaintiff to "simple jobs," but did not include any deficiencies regarding concentration, persistence or pace that resulted in a complete failure to complete tasks in a timely manner. 92 F.3d at 694-95. On cross-examination, the vocational expert stated a moderate deficiency in concentration and persistence would cause problems on an ongoing daily basis at the identified jobs regardless of what the job required from a physical or skill standpoint. *Newton*, 92 F.3d at 695.

24

However, in *Brachtel v. Apfel*, 132 F.3d 417, 421 (8th Cir. 1997), the Eighth Circuit distinguished *Newton* by holding that when the ALJ includes additional limitations, such as the plaintiff cannot engage in work requiring "close attention to detail" or at "more than a regular pace," the ALJ sufficiently encompasses deficiencies in concentration, persistence or pace. *Id.* Similar to *Brachtel,* and distinguishable from *Newton*, the ALJ in the instant case asked vocational expert Susan Johnson to testify about the employment opportunities for a hypothetical person of Plaintiff's age, education, and work experience who was "limited to jobs involving only simple, routine, repetitive tasks, few changes in work setting, no tandem tasks, only occasional work related decisions, with only occasional interactions with supervisors, coworkers, and no interactions with the general public." (Tr. 48). According to Ms. Johnson, such an individual would be unable to perform Plaintiff's past work but would be able to perform other jobs in the national economy, such as automobile washer, labeler, and addresser. (Tr. 48-49).

Thus, the ALJ did not simply limit Plaintiff to a "simple work" limitation but also limited Plaintiff's need to interact with supervisors, co-workers, and the public, and further limited Plaintiff to routine work with few changes in work setting, occasional work related decisions, and no tandem tasks. On the record before the Court, as in *Brachtel*, these additional limitations are "enough to distinguish this case from *Newton*." *Brachtel*, 132 F.3d at 421. *See also Fleming v. Colvin*, No. 4:15-CV-1150-SPM, 2016 WL 4493683, at *8 (E.D. Mo. Aug. 26, 2016) (an RFC limiting the Plaintiff to occasional interaction with supervisors, co-workers, and the public appropriately limits exposure to potential distractions and is sufficient to account for limitations in concentration, persistence or pace).

25

Moreover, the Eighth Circuit has found hypotheticals presented to vocational experts regarding concentration, persistence or pace that included the limitations of "simple, routine, repetitive work" and "simple, repetitive, routine tasks" adequately captured claimants' deficiencies in concentration, persistence or pace. *See Howard*, 255 F.3d at 582 (ALJ's hypothetical concerning someone who is capable of doing simple, routine tasks adequately captures claimant's deficiencies in concentration, persistence or pace). *See also Tyman v. Colvin*, No. 4:12-CV-W-01022-REL, 2014 WL 467517, at *13 (W.D. Mo. Feb. 6, 2014) ("The Eighth Circuit has held that a limitation to simple, repetitive, and routine tasks adequately captures a plaintiff's deficiencies in concentration, persistence, and pace.")

More recently, in *Harvey v. Colvin*, 839 F.3d 714 (8th Cir. 2016), a plaintiff alleged disability based upon mood disorder, anxiety disorder, and the residual effects of a brain tumor. The claimant in *Harvey* suffered "moderate brain atrophy" and had "major difficulty" of "overall slowness and slow processing." *Id.* In accounting for these limitations, the ALJ limited the plaintiff to "only simple, routine, and repetitive work, work that doesn't require any close attention to detail or use of independent judgment on the job." *Id. Harvey* approved the hypothetical question presented to the vocational expert based on the "simple, routine, and repetitive work" language, citing to *Howard* and *Brachtel*.

Plaintiff contends the RFC is deficient as a matter of law. However, this Court finds the RFC is well-supported in law and fact. The ALJ formulated the RFC on the basis of the entire record, which included consideration of the non-examining state agency physician, Margaret Sullivan; medical source statements and treatment notes of Plaintiff's treating physician, William Irvin, M.D.; extensive and voluminous VA treatment notes which showed improvement in

symptoms and lack of inpatient hospitalizations; the Third Party Function Report prepared by
Plaintiff's spouse, Veronica Cain; and Plaintiff's own Function Report.

Based on the record in this case and the foregoing case law, the Court finds the ALJ's
RFC determination adequately compensated for Plaintiff's moderate limitations in concentration,
persistence or pace.

## B. Evaluation of Opinion Evidence

### 1. Dr. Irvin

Plaintiff also argues the ALJ failed to give good reasons in attributing only partial weight
to Dr. Irvin's opinions. Plaintiff maintains clinical observations from Dr. Irvin and his other
mental health physicians provide support for Dr. Irvin's opinion that Plaintiff cannot maintain
employment due to depression.

"Whether the ALJ grants a treating physician's opinion substantial or little weight, the
regulations provide that the ALJ must 'always give good reasons' for the particular weight given
to a treating physician's evaluation." *Prosch v. Apfel*, 201 F.3d 1010, 1013 (8th Cir. 2000).
"Medical opinions are statements from physicians and psychologists or other acceptable medical
sources that reflect judgments about the nature and severity of a claimant's impairments,
including symptoms, diagnosis and prognosis, and what the claimant can still do despite her
impairments and her physical or mental restrictions." 20 C.F.R. §§ 404.1527, 416.927(a)(2). All
medical opinions, whether by treating or consultative examiners are weighed based on (1)
whether the provider examined the claimant; (2) whether the provider is a treating source; (3)
length of treatment relationship and frequency of examination, including nature and extent of the
treatment relationship; (4) supportability of opinion with medical signs, laboratory findings, and

explanation; (5) consistency with the record as a whole; (6) specialization; and (7) other factors which tend to support or contradict the opinion. 20 C.F.R. §§ 404.1527(c), 416.927(c).

Generally, a treating physician's opinion is given controlling weight, but is not inherently entitled to it. *Hacker v. Barnhart*, 459 F.3d 934, 937 (8th Cir. 2006). A treating physician's opinion "does not automatically control or obviate the need to evaluate the record as [a] whole." *Leckenby v. Astrue*, 487 F.3d 626, 632 (8th Cir. 2007). A treating physician's opinion will be given controlling weight if the opinion is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the case record. 20 C.F.R. §§ 404, 1527(c)(2), 416.927(c)(2). "Good reasons for assigning lesser weight to the opinion of a treating source exist where the treating physician's opinions themselves are inconsistent or where other medical assessments are supported by better or more thorough evidence." *Chesser v. Berryhill*, 858 F.3d 1161, 1164 (8th Cir. 2017) (internal citations omitted).

The ALJ did not entirely disregard the opinion evidence of Plaintiff's treating physician, Dr. Irvin, or reduce the weight applied to his treatment notes during regular examination. Instead, the ALJ isolated Dr. Irvin's March 15, 2017, January 30, 2018, and November 20, 2018 medical source statements and assigned those specific opinions partial weight. The ALJ determined Dr. Irvin's opinions in those specific documents regarding Plaintiff's inability to maintain gainful employment were inconsistent with the providers' own treatment records and other substantial evidence in the record. In making this evaluation, the ALJ wrote:

> The undersigned gives only partial weight to the medical source statements of the claimant's treating physician, William Irvin, M.D. provided in March 2017, January 2018, and November 2018, who opined that the claimant has marked and extreme limitations in work performance (maintaining concentration and attention,

making simple work decisions, and completing a normal workday/work week due to adverse psychological symptoms), social interactions with customers, public, co-workers, and supervisors, and adapting to the work environment (coping with stress and changes in routine and maintaining a reliable work presence). Such severe limitations are not substantiated by the written treatment notes, which actually show improvement in symptoms, as noted above. Even prior to the most recent treatment notes, the claimant, while diagnosed and treated for depression for many years prior to the alleged onset date and increased symptoms due to more recent homelessness and loss of job, had mostly normal mental status examinations. Further, no weight is given to the portions of Dr. Irvin's opinions indicating the claimant is disabled and cannot work, as that is an issue reserved to the determination of the Commissioner.

(Tr. 15-16) (citations to record omitted).

The ALJ's decision cited to various VA medical treatment notes which described Plaintiff as calm, coherent, ideationally very active with good concentration, possessing positive expectations, adequate insight and judgment, increasing positive mood with new therapeutic options presented to him, softened negative social evaluations, fully alert and oriented, and cooperative with good/fair eye contact and normal speech. (Tr. 15, 19). The ALJ noted "[t]esting completed during the period in question showed no cognitive memory deficits" and that "updated treatment notes reflect the [Plaintiff] had good insight and judgment, linear thought, and answered questions appropriately." (Tr. 14). The ALJ considered Plaintiff's successful participation in an occupational therapy creative writing group and self-indicated he would be getting out of his apartment more often. (Tr. 19). The ALJ cited to reports from Plaintiff's occupational therapist, which highlighted Plaintiff's ability to compose "very detailed" and "well written pieces." (Tr. 15). The ALJ noted while Plaintiff was treated regularly for mental health symptoms, the visits were outpatient and he was never hospitalized. (Tr. 19). The ALJ cited to Dr. Irvin's 2018 treatment notes in which Plaintiff reported himself as doing generally well and a follow-up would be scheduled two to three months later. The ALJ considered updated treatments

notes which reflected largely normal mental status examinations despite occasionally displaying a flat affect. *Id.* The ALJ referenced portions of the medical record indicating his diabetes to be controlled and no issues of significant pain or other physical impairments. *Id.* In conjunction with the medical records, the ALJ considered the Third-Party Function report prepared by Plaintiff's wife, which did not endorse any physical limitations and indicated his ability to participate in several activities of daily living. (Tr. 15-16). The ALJ also considered the report of Dr. Margaret Sullivan, a non-examining state agency physician, who determined Plaintiff's psychosis to be in remission, that he was not gravely disabled, did not lack the capacity to make decisions, and was independent in driving, making financial decisions, and making decisions about his medication and treatment. (Tr. 15)

In light of the medical record as a whole, it was appropriate for the ALJ to attribute partial weight to the three specific documents Dr. Irvin submitted to the Social Security Administration in support of Plaintiff's claim of an inability to maintain gainful employment. *See, e.g.*, *Fentress v. Berryhill*, 854 F.3d 1016, 1020 (8th Cir. 2017) ("A physician's opinion that a claimant is incapable of gainful employment is often not entitled to significant weight."); *Flynn v. Astrue*, 513 F.3d 788, 793 (8th Cir. 2008) (substantial medical evidence supported the ALJ's conclusion that a claimant diagnosed with fibromyalgia was capable of light work where the record included treatment notes that the claimant had normal muscle strength). The ALJ was responsible for weighing the conflicting evidence, and the Court cannot say that the ALJ's decision fell outside the available "zone of choice."

It is also significant that the opinions of Dr. Irvin that the ALJ afforded partial weight were produced on a checkbox form and provided very little elaboration or detail regarding the

30

basis for his opinions. The Eighth Circuit has repeatedly found opinions offered in conclusory, checkbox form are entitled to less weight. *See Anderson v. Astrue*, 696 F.3d 790, 794 (8th Cir. 2012) (affirming the ALJ's decision to discount the opinion of a treating physician in part because of the form in which it was offered; stating, "[W]e have recognized that a conclusory checkbox form has little evidentiary value when it 'cites no medical evidence, and provides little to no elaboration'") (quoting *Wildman v. Astrue*, 596 F.3d 959, 964 (8th Cir. 2010)).

For all the above reasons, the Court finds the ALJ gave good reasons to support her decision to partially discount Dr. Irvin's opinion evidence, and those reasons were supported by substantial evidence. The ALJ's decision makes clear she considered all the relevant evidence in assessing Dr. Irvin's opinions specifically related to Plaintiff's ability to maintain gainful employment. She weighed Dr. Irvin's opinions along with the other evidence, including other opinion evidence, and it is not the role of this Court to reweigh that evidence. The ALJ's assessment fell within the available "zone of choice." *See Hacker v. Barnhart*, 459 F.3d 934, 937-38 (8th Cir. 2006).

### 2. Julie Mastnak, Ph.D. and Sarah Wahl, Ph.D.

Plaintiff also argues the ALJ erred in affording no weight to the opinions of Julie Mastnak, Ph.D. and Sarah Wahl, Ph.D., who opined that Plaintiff's depression caused him "total occupational and social impairment." The Commissioner maintains the ALJ properly gave no weight to those opinions because she found them inconsistent with the record as a whole.

In her decision to attribute no weight to the opinions of Dr. Mastnak and Dr. Wahl, the ALJ wrote, in part:

> These evaluations found, among other items, that the claimant had difficulties in
> social isolation decreased concentration and focus, and paranoid feelings. Of

31

special note, the undersigned observes that treatment notes from the VA actually demonstrate the claimant does not experience marked or extreme limitations (including documenting appropriate interaction with treating providers and other group therapy participants, appearing timely for appointments, denying suicidal/homicidal ideation, and reporting that he had appropriate dress among other notations). In considering these VA disability ratings, the undersigned notes that the standards for determining disability in Veteran's benefits cases are completely different than the standards used in Social Security cases, and these are inherently neither valuable nor persuasive in deciding disability under the Agency's standards.

(Tr. 16).

The ALJ correctly noted that the Social Security Administration is not bound by the VA's decision to award disability benefits. *See Pelkey v. Barnhart*, 433 F.3d 575, 579 (8th Cir. 2006) (the ALJ should consider the VA's finding of disability, but is not bound by the disability rating of another agency when evaluating whether claimant is disabled for purposes of social security benefits); *Jenkins v. Chater*, 76 F.3d 231, 233 (8th Cir. 1996) (a disability determination by the VA is not binding on an ALJ considering a Social Security applicant's claim for disability benefits). Social security disability determinations are based on social security law. 20 C.F.R. § 404.1504.

Moreover, the ALJ did not discount Dr. Wahl and Dr. Mastnak's opinions solely on the fact that they were based on a different standard.  To the contrary, the ALJ explained that the "total occupational and social impairment" conclusions were not fully supported by the record before the Social Security Administration. For example, the ALJ noted that the VA found Plaintiff to have difficulties in social isolation, but the medical record reflected Plaintiff's historical success in a group therapy environment and ability to interact appropriately with his treating providers. As noted above in the discussion of Dr. Irvin's opinion evidence, the ALJ's decision makes clear that she considered all the relevant medical evidence in assessing Plaintiff's

32

RFC. The record in this case contained substantial evidence to support the ALJ's decision. Thus, the Court finds the ALJ properly considered the VA's disability rating and did not err in giving the rating no weight.

* * * * *

For the foregoing reasons, the Court finds the ALJ's determination is supported by substantial evidence on the record as a whole.

Accordingly,

**IT IS HEREBY ORDERED** that the decision of the Commissioner is **AFFIRMED**.

A separate Judgment shall accompany this Memorandum and Order.

Dated this 1st day of October, 2020.

*/s/ Stephen R. Welby*_____
STEPHEN R. WELBY
UNITED STATES MAGISTRATE JUDGE